1
2
3
4   UNITED STATES DISTRICT COURT
5   NORTHERN DISTRICT OF CALIFORNIA
6
7   ERIC EUGENE SMITH,                          Case No. 16-cv-06203-YGR
    Plaintiff.
8
9   v.                                          **ORDER GRANTING DEFENDANTS'
                                                MOTION FOR SUMMARY JUDGMENT**
10  TIMOTHY FRIEDERICHS, et al.,                Re: Dkt. No. 52
11  Defendants.

Plaintiff Eric Eugene Smith is a state prisoner who has been incarcerated since 1987. Smith brings two claims against defendants Timothy Friederichs, M.D., the California State Department of Rehabilitation Correctional Training Facility (the "CTF"), and the California Department of Corrections and Rehabilitations (the "CDCR") for (i) common law medical negligence and (ii) section 1983 denial of medical care claim under the Eighth Amendment. Now before the Court is defendants' motion for summary judgment. (Dkt. No. 52, Motion.)

The Court having carefully considered the papers, pleadings, admissible evidence, and arguments of the parties, **GRANTS** defendants' motion.

I.  **BACKGROUND**

Plaintiff Smith is a state prisoner who was transferred to the CTF in Soledad, California, in December 2009. (Dkt. No. 1-1, Complaint ¶ 3; Motion, Ex. A, Declaration of Timothy Friederichs ("Friederichs Decl.") ¶ 12.) Since that time Dr. Friederichs has served as Smith's primary care physician and has treated Smith for diabetes, chronic gastroesophageal reflux disease, hypertension, and back pain. (*Id.* at ¶ 13; Ex. C, Medical Records at AG 01227-1228, 1234-1225, 1240-1241, 1247-1248, 1251-1252, 1254-1255, 1257, 1261-1262, 1267.)

On September 15, 2015, Smith informed Dr. Friederichs that he had been experiencing neck pain for approximately three weeks. (*Id.,* Ex. A ¶ 15.) Dr. Friederichs ordered an x-ray of

1  Smith's neck vertebrae and prescribed Ibuprofen for pain relief. (*Id.*) The x-ray revealed mild
2  arthritis and spine fractures which Dr. Friederichs apparently believed were the result of a prior
3  motorcycle injury. (*Id.* at ¶ 16.) According to Dr. Friederichs, Smith did not complain about
4  headaches, nausea, or dizziness at this appointment. (*Id.* at ¶ 15.)

During a morning appointment with Dr. Friederichs on September 25, 2015, Smith complained of dizziness. (*Id.*, Medical Records, AG00037-39, 40-43.) Dr. Friederichs examined Smith for signs of a neurological disorder by checking for abnormal pressure in Smith's skull and focal neurologic irregularities. (*Id.* at ¶ 19, 20, 24.) Dr. Friederichs testified that based on his evaluation he believed that Smith was suffering from either an inner ear condition known as labyrinthitis or early meniere's disease. (*Id.* at ¶ 20.) Dr. Friederichs irrigated Smith's ears, prescribed meclizine for dizziness and nasal spray, and scheduled a follow-up appointment for seven to fourteen days later. (*Id.* at ¶¶ 20, 24; Medical Records at AG 00040-41.)

However, Smith returned to the clinic that same day complaining of a headache. (*Id.* at ¶¶ 21, 22; Medical Records at AG 00039–43.) Dr. Friederichs again examined Smith and administered an injection of Toradol for pain. (*Id.* at ¶ 24; Medical Records at AG 00039.) Dr. Smith's treatment notes indicate that he kept the follow-up appointment scheduled for seven to fourteen days later, but instructed Smith to "return sooner if HA [headaches] & nausea persist." (*Id.*, Medical Records at AG 00043.)

Dr. Friederichs next saw Smith ten days later on October 5, 2015. (*Id.*, Ex. A ¶ 28; Medical Records at AG 00049-50.) Dr. Friederichs' treatment notes state that during this appointment Smith indicated that he was "generally feeling better" and "has had no more dizzy spells since he is taking meclizine." (*Id.*, Medical Records at AG 00049-50.) Further, Dr. Friederichs set out a treatment plan which included meclizine for dizziness, Metformin, Glipizide, Aspirin, Lisinopril, Claritin, Motrin, rantitine, and nasal spray. (*Id.*)

Plaintiff alleges that "[i]n or about October 18, 2016, Mr. Smith complained of intense pain and was taken to the prison infirmary as a result of vomiting." (Complaint at ¶ 27.) Three days later, on October 21, 2015, Smith "was found in a pool of his own vomit and was unresponsive. As a result of this Mr. Smith was rushed to the Natividad Medical Center." (*Id*. at

¶ 28.) According to plaintiff, surgeons at the Natividad Medical Center detected and removed "a tumor the 'size of an orange'" in Smith's brain "which had been growing undetected by Defendants for years." (*Id.* at ¶ 29.) Plaintiff alleges that as a result of this surgery Smith experienced "memory loss, loss of speech capacity, and loss of mobility." (*Id.* at ¶ 30.)

On November 18, 2015, Smith's attorney, namely James D. Hornbuckle, sent a one-page letter addressed to Warden B. Jordan at Soledad prison which stated that Hornbuckle had "been retained to legally represent [Smith] . . . [regarding] claims arising out of Medical negligence, [and] failing to provide the standard of care for human life." (Dkt. No. 54-1, Letter from James D. Hornbuckle to Warden B. Jordan ("Hornbuckle Letter").) On September 23, 2016, this lawsuit ensued.

## II. SUMMARY JUDGMENT FRAMEWORK

Summary judgment is proper if the pleadings and evidence in the record "show that there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Any party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. *Id.* at 248–49.

Defendants, in their motions, have the burden of producing evidence negating an essential element of each claim on which they seek judgment or showing that plaintiff cannot produce evidence sufficient to satisfy their burden of proof at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000). If defendants meet that burden, plaintiff may defeat summary judgment by showing, through admissible evidence, that a material factual dispute exists. *California v.Campbell.* 138 F.3d 772, 780 (9th Cir. 1998). When deciding a summary judgment motion, courts must view the evidence in the light most favorable to the nonmoving parties and draw all justifiable inferences in their favor. *Anderson,* 477 U.S. at 255;

3

*Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011). Summary judgment is rarely appropriate when credibility is at issue. *SEC v. M & A West. Inc.,* 538 F.3d 1043, 1055 (9th Cir. 2008). "Where the facts are disputed, their resolution and determinations of credibility 'are manifestly the province of a jury.'" *Wall v. County of Orange,* 364 F.3d 1107, 1110–11 (9th Cir. 2004) (quoting *Santos v. Gates,* 287 F.3d 846, 852 (9th Cir. 2002)).

**III. DISCUSSION**

Defendants argue that they are entitled to summary judgment on four grounds: First, Smith's medical negligence claim against the CTF and CDCR are barred under California's Government Claims Act (the "Claims Act"). Second, plaintiff's federal claim under the Eighth Amendment is barred because Smith did not exhaust administrative remedies pursuant to the Prisoner Ligation Reform Act ("PLRA"). Third, plaintiff's claim for medical negligence fails on the merits because Dr. Friederichs' treatment of Smith was consistent with the skill, prudence, and diligence which other members of the medical profession commonly possess and exercise. Finally, Smith's federal Eighth Amendment claim fails on the merits because plaintiff offers no evidence of subjective deliberate indifference.

**A. Government Claims Act**

The Claims Act, Cal. Gov. Code § 810, *et seq.*, was enacted to "provide the public entity sufficient information to adequately investigate claims and settle them, if appropriate, without the expense of litigation." *City of San Jose v. Superior Court*, 12 Cal. 3d 447, 455 (1974). Pursuant to the Claims Act, any "claim relating to a cause of action for death or for injury" must be presented to the state "not later than six months after the accrual of the cause of action." Cal. Gov. Code § 911.2.

A "person presenting a claim *shall* use the [Government Claims Program] form in order that his or her claim is deemed in conformity" with the Claims Act. Cal. Gov. Code § 910.4 (emphasis supplied). A claim "*shall show all of the following* . . . . (c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted . . . . (e) The name or names of the public employee or employees causing the injury, damage, or loss, if known." Cal Gov. Code § 910 (emphasis supplied). Under section 915(b), the claim "*shall* be

4

presented to the state by either of the following means: (1) Delivering it to the Department of General Services. (2) Mailing it to the Department of General Services at its principal office." (Emphasis supplied.)

A plaintiff may not bring a "suit for money or damages . . . against a public entity until a written claim has been presented to the public entity and the claim either has been acted upon or is deemed to have been rejected." *Hart v. Alameda County*, 76 Cal.App.4th 766, 778 (1999) (quoting Cal. Gov. Code § 945.4). The California Supreme Court has held that the "claimant bears the burden of ensuring that the claim is presented to the appropriate public entity." *DiCampli-Mintz v. Cty. of Santa Clara*, 55 Cal. 4th 983, 991 (2012) (citing *Life v. County of Los Angeles* 227 Cal.App.3d 894, 901 (1991)).

Here, plaintiff does not argue that Smith completed a Government Claims Program form or "presented [his claim] to the state" by having the claim delivered to the Department of General Services or mailing the claim to the Department of General Services at its principal office. Instead, plaintiff argues that the Hornbuckle Letter satisfies the Claims Act because it "substantially complies with the statutory requirements." (Dkt. No. 54, Opposition at 4.)

Plaintiff's argument fails. The statute's repeated use of the word "shall" indicates mandatory compliance. Plaintiff cites no authority to the contrary, nor for the proposition that substantial compliance with the Claims Act is sufficient. Further, and in any event, plaintiff has not shown substantial compliance: First, plaintiff did not use the requirement Government Claims Program form. Second, the Hornbuckle Letter failed to indicate the "date, place and other circumstances of the occurrence or transaction which gave rise to the claim." *See* Cal Gov. Code § 910. Third, the Hornbuckle Letter did not state the name "of the public employee . . . causing the injury, damage, or loss," namely Dr. Friederichs. *Id*. Fourth, plaintiff never presented his claim to the state by having the claim delivered to the Department of General Services or mailing it to Department of General Services at its principal office.

Accordingly, the Court finds that plaintiff's medical negligence claim against the State Defendants is barred under the Claims Act. Therefore, with regard to the state defendants, namely

1 the CTF and CDCR, the Court **GRANTS** defendants' motion for summary judgment on plaintiff's medical negligence claim.

### B. Prison Litigation Reform Act

"The Prison Litigation Reform Act requires that a prisoner exhaust available administrative remedies before bringing a federal action concerning prison conditions." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009). To exhaust remedies properly, a prisoner must "use all steps the prison holds, enabling the prison to reach the merits of the issue." *Id*. (citing *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). The exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence. *See Porter v. Nussle*, 534 U.S. 516, 524-32 (2002); *see also Roles v. Maddox*, 439 F.3d 1016, 1018 (9th Cir. 2006).

With regard to medical care claims, a prisoner can initiate a grievance by filing a CDCR 602 Health Care Appeal Form (the "602 Form") with the prison. (Motion, Ex. E, Declaration of Marti L. Votaw ("Votaw Decl.") ¶ 4; Ex. F, Declaration of Custodian of Records for California Correction Health Services.) Here, the record reflects that Smith never filed a 602 Form regarding the medical treatment which he received from Dr. Friederichs. (*Id*., Votaw Decl. ¶¶ 5, 6.)

Plaintiff concedes that "inmates must exhaust their administrative remedies before filing a lawsuit over prison conditions," but argues that "this requirement is limited to those remedies that are actually available to the inmate." (Opposition at 4.) Specifically, plaintiff relies on *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011), in asserting that the exhaustion requirement does not apply "if prison officials erroneously inform an inmate that the remedy does not exist or if the prison officials fail to provide access to the grievance procedures." (*Id*.) Plaintiff's argument does not persuade in light of plaintiff's failure to proffer a single piece of evidence that CTF officials (i) erroneously informed Smith that an administrative remedy did not exist or (ii) failed to provide Smith with access to the grievance procedures including the 602 Form.

Next, plaintiff cites *White v. Bukowski*, 800 F.3d 392 (7th Cir. 2015), in arguing that remedies are often unavailable in the medical care context because "inmates will be unable to grieve poor medical care until after the harm done by the improper care is complete and cannot be undone." (Opposition at 5.) In *White*, plaintiff inmate was eight-months pregnant when she made

an oral request for prenatal care which the prison officials refused. *White*, 800 F.3d at 393-94. After plaintiff's child was born with birth defects plaintiff filed a section 1983 claim for deliberate indifference. *Id.* at 394. The Seventh Circuit reasoned that plaintiff was not required to exhaust administrative remedies because plaintiff "wasn't about to become pregnant again, and in fact had just a few more days in the jail." *Id*. Therefore, the Seventh Circuit concluded that plaintiff's remedies were merely "academic" and that no remedy was actually available to plaintiff. *Id*. Plaintiff's reliance on *White* is misplaced because that case is easily distinguishable. Unlike in *White* where the court reasoned that plaintiff lacked administrative remedies because she "wasn't about to become pregnant again" in her four remaining days at the jail, Smith concedes "the high likelihood of reoccurrence with this tumor type." (Opposition at 8.) Because Smith complains of continuing ongoing and future needs arising from the same set of circumstances, he was required to exhaust administrative remedies through the grievance process.

Accordingly, the Court finds that Smith failed to exhaust his administrative remedies. Therefore, plaintiff's federal claims are barred under the PLRA and the Court **GRANTS** defendants' Motion with regard to Smith's claim for denial of adequate medical care under the Eighth Amendment.

### C. Medical Negligence Claim

To prevail on a claim for medical negligence plaintiff must prove four elements, namely "(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." *Johnson v. Superior Court*, 143 Cal. App.4th 297, 305 (2006) (citing *Hanson v. Grode*, 76 Cal.App.4th 601, 606 (1999)).

Defendants seek summary judgment on the grounds that plaintiff fails to introduce evidence sufficient to establish a triable issue as to the first and second elements, namely whether Dr. Friederichs breached a duty of care to Smith by failing to provide treatment consistent with the "skill, prudence, and diligence as other members of the [medical] profession commonly possess and exercise." *Id*.

In support of their summary judgment motion defendants offer the expert declaration of Dr. Cassini who opines that Dr. Friederichs' decision not to order imaging of Smith's brain after plaintiff complained of neck pain on September 15, 2015, met the standard of care because "Dr. Friederichs ordered an x-ray of the cervical spine as a workup of Mr. Smith's sore neck." (Motion, Ex. B, Declaration of Dr. Peter Cassini, ("Cassini Decl.") at ¶ 11.) Second, Dr. Cassini testified that Dr. Friederichs' physical exam of Smith on September 25, 2015, met the standard of care in light of Dr. Friederichs' thorough evaluation of Smith's right posterior neck, right trapezius, strength, and reflexes; and Dr. Friederichs' decision to prescribe meclizine, Claritin, and deep-sea nasal spray." (*Id.* at ¶ 12.) Third, Dr. Cassini states that the treatment administered on October 5, 2015, met the standard of care because Dr. Friederichs conducted three "fecal occult blood tests [which] were all negative" and "plaintiff reported no further dizzy spells since being prescribed meclizine." (*Id.* at ¶ 13.)

Accordingly, Dr. Cassini concluded that Dr. Friederichs' treatment of Smith "was within the standard of care" because "Smith's presentation of dizziness and headache in September and October 2015 fit with the diagnosis of acute labyrinthitis" which is "a common . . . condition that is self-limiting and only requires supportive care" and "[n]othing in the medical records suggests a progressive clinical course involving focal neurological deficits." (*Id.* at ¶¶ 15, 17.) Dr. Cassini further concluded that Smith's symptoms were "appropriately diagnosed as labyrinthitis given the physical findings on [the exams which Dr. Friederichs conducted] and the fact that [labyrinthitis] is a common condition." Finally, Dr. Cassini noted that "the time between Smith's initial presentation with vertigo and his seizures did not affect Smith's need for surgery or final outcome, or condition following surgical recitation of his tumor. (*Id.* at ¶ 20)

In his opposition, plaintiff counters with an expert declaration but fails utterly to provide the Court with any actual factual support upon which the expert's opinions are allegedly based. For instance, while Dr. Mia Moon asserts that Dr. Friederichs breached the standard of care by failing to document or order certain conditions or procedures,[1] she fails to provide any explanation

---

[1] *See* Opposition at 6-7.

or link to how those particular issues were required by or would have fallen below the standard of care. A bald listing is insufficient. Equally important, Dr. Moon proffers numerous "facts" about plaintiff's medical conditions contrary to those proffered by defendants, but fails to provide a single citation to the factual record or provide the Court with the factual basis of the assertions.

The Court is not in a position to accept these assertions blindly, especially in light of the proper factual showing made by defendants. Plaintiff has an affirmative obligation to show the existence of material disputed facts to be tried and failed to do so.[2]

Accordingly, based on the state of the record, the Court **GRANTS** defendants' motion for summary judgment on plaintiff's claim for medical negligence.

### D. Eighth Amendment Denial of Medical Care Claim

"Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Supreme Court has held that prison officials' "deliberate indifference to serious medical needs of prisoners" violates the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). However, "prisoner officials cannot be liable under the Eighth Amendment for denying an inmate adequate conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Put differently, a claim for denial of adequate medical care under the Eighth Amendment requires that the "prison official must *subjectively* have a sufficiently culpable state of mind." *Estate of Ford v. Ramirez–Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002) (emphasis in original); *see also Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (plaintiff must show that defendant selected a course of treatment "in *conscious disregard* of an excessive risk to plaintiff's health") (emphasis supplied).

---

[2] Interestingly, and by contrast, during her deposition Dr. Moon stated that she did not disagree with "anything" in Dr. Cassini's report. (Dkt. No. 55, Ex. A, Deposition of Mia K. Moon at 248:24-249:19.)

9

Smith's medical care claim under the Eighth Amendment fails because plaintiff proffers no evidence that Dr. Friederichs was deliberately indifferent to Smith's condition under a subjective standard. *Estate of Ford*, 301 F.3d at 1049. Specifically, Smith makes no showing that Dr. Friederichs selected a course of treatment "in conscious disregard of an excessive risk to plaintiff's health." *Jackson*, 90 F.3d at 332.

The record reflects that Dr. Friederichs examined plaintiff on September 25, 2015, after Smith complained of dizziness. (Medical Records at AG00037-39, 40-43.) Dr. Friederichs examined Smith for signs of a neurological disorder by checking for abnormal pressure in Smith's skull focal neurologic signs. (Friederichs Decl. at ¶ 19, 20, 24.) Dr. Friederichs testified that based on his evaluation he believed that Smith was suffering from either an inner ear condition known as labyrinthitis or early meniere's disease. (*Id.* at ¶ 20.) Dr. Friederichs irrigated Smith's ears, prescribed meclizine for dizziness and nasal spray, and scheduled a follow-up appointment for seven to fourteen days later. (*Id.* ¶¶ 20, 24, Ex. C, AG 00040-41.) When Smith returned to the clinic complaining of a headache, Dr. Friederichs again examined Smith and administered an injection of Toradol for pain. (*Id.* at ¶¶ 21, 22, 24; Medical Records at AG 00039, 43.) Dr. Smith's treatment notes indicate that he scheduled a follow-up appointment scheduled for seven to fourteen days later, and instructed Smith "return sooner if HA [headaches] & nausea persist." (*Id.*, Ex. C at AG 00043.) Dr. Friederichs next saw Smith ten days later on October 5, 2015. (*Id.*, Ex. A ¶ 28; Medical Records at AG 00049-50.) Dr. Friederichs' treatment notes state that during that appointment Smith indicated that he was "generally feeling better" and "has had no more dizzy spells since he is taking meclizine." (*Id.*, Medical Records at AG 00049-50.) Finally, Dr. Friederichs set out a treatment plan which included meclizine for dizziness, Metformin, Glipizide, Aspirin, Lisinopril, Claritin, Motrin, rantitine, nasal spray. (*Id.*)

Based on these facts, the Court finds that plaintiff has failed to establish a triable issue as to deliberate indifference. The mere fact that Dr. Moon would have selected a different course of treatment is insufficient "to show deliberate indifference as a matter of law." *Jackson*, 90 F.3d at 332. Therefore, the Court **GRANTS** defendants' motion for summary judgment on plaintiff's claim for denial of adequate medical care under the Eighth Amendment.

## IV. CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is **GRANTED**.[3]
The parties shall provide a form of judgment approved as to form within five business days.

This terminates Dkt. No. 52.

**IT IS SO ORDERED.**

Dated: January 4, 2018

_____
YVONNE GONZALEZ ROGERS
United States District Judge

---

[3] In light of the Court's ruling, the Court decline to address defendants' objections to plaintiff's evidence.